an "immediate mistrial" on the ground that any verdict would be the product of judicial coercion, and there is no indication in the record that the defendant had retreated from this position. *fn34 See United States v. Goldstein, supra, 479 F.2d 1067 (that defendant previously moved for mistrial weighed in favor of finding of consent even though defendant's motion had been denied and record contained indication that defendant had changed his mind); cf. United States v. Buljubasic, supra, 808 F.2d 1265 (factor to consider is whether defendant indicates that he or she no longer sought mistrial).

[88]   The only fact that weighs in the defendant's favor is defense counsel's request that the jurors be polled to determine whether they had reached a partial verdict. This request was not accompanied by an objection to the declaration of a mistrial, however. Furthermore, once the trial court denied the defendant's request to poll the jurors and clearly indicated that it intended to declare a mistrial, the defendant did not object even though the trial court invited defense counsel to register any objection he may have had to the declaration of a mistrial. Thus, the record does not substantiate the defendant's claim that the court's failure to poll the jury necessarily vitiated his consent to the mistrial.

[89]   Finally, and importantly, the defendant himself had sought a mistrial on the ground that the jury had reached a verdict of not guilty on the murder charge. At no time did the defendant claim that the jury had reached such a verdict on the charge of manslaughter in the first degree with a firearm. In fact, the defendant represented, in connection with his amended motion to dismiss, which he filed after the declaration of the mistrial but before the second trial had commenced, that he had learned that the jury unanimously had found him not guilty of murder and had deadlocked on the lesser charge of manslaughter in the first degree with a firearm. The defendant's acknowledgment that the jury had deadlocked on the manslaughter charge necessarily constituted a concession that the jury had not reached a verdict on that charge. In such circumstances, the court's failure to poll the jury on the charge of manslaughter in the first degree with a firearm could not have harmed the defendant and, in view of his own requests for a mistrial, there is no reason to believe that the defendant did not consent to the trial court's declaration of the mistrial.

[90]   In light of the foregoing, the defendant's only viable double jeopardy claim arises out of the court's failure to poll the jury in regard to the murder charge. The state, however, in the exercise of its discretion, elected not to retry the defendant for murder, thereby rendering moot any double jeopardy challenge to his retrial on that charge. Consequently, in light of this fact and the fact that the defendant consented to the trial court's declaration of the mistrial, he has no legitimate claim that he was prejudiced by the court's failure to poll the jury before declaring the mistrial.

[91]   The judgment is affirmed.

[92]   In this opinion the other justices concurred.

Opinion Footnotes



[93]   *fn1 General Statutes § 53a-55a provides in relevant part: "(a) A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm...." General Statutes § 53a-55 provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person . . . or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person...."

[94]   *fn2 The trial court sentenced the defendant to a term of twenty-seven years imprisonment.

[95]   *fn3 The defendant initially appealed to the Appellate Court. Because the defendant should have taken his appeal directly to this court; see General Statutes § 51-199 (b) (3); his case was transferred to this court pursuant to Practice Book § 65-4.

[96]   *fn4 Other witnesses testified that they heard the victim make a somewhat different threat. One such witness testified that he heard the victim say, "Nobody puts a gun to my head and lives [un]til tomorrow." A second witness testified that the victim said, "Nobody pulls a gun on me and lives . . . ."

[97]   *fn5 The testimony varied as to the exact sequence of the shots. Three witnesses testified that they heard a single shot followed by a short pause and then several shots in succession. Two other witnesses testified, however, that the shots were fired in succession.

[98]   *fn6 General Statutes § 53a-19 provides in relevant part: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself . . . from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm. "(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor . . . or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform. "(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively



communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force ...."

[99]   *fn7 General Statutes § 53a-12 (a) provides: "When a defense other than an affirmative defense, is raised at a trial, the state shall have the burden of disproving such defense beyond a reasonable doubt." Our Penal Code characterizes self-defense as a nonaffirmative defense that the state must disprove beyond a reasonable doubt. See General Statutes § 53a-16 ("[i]n any prosecution for an offense, justification, as defined in sections 53a-17 to 53a-23, inclusive, shall be a defense" [emphasis added]).

[100]  *fn8 The self-defense claim raised by the defendant, who did not testify, was predicated on the testimony of the state's witnesses, several witnesses who testified in the defendant's case-in-chief and certain documentary evidence.

[101]  *fn9 The defendant's written statement, which was introduced as a full exhibit, provides in relevant part: "On Sunday Jan[uary] 26, 1997 I went to Uncle Al's [Cafe in Danbury] with my girlfriend Susan Bruemmer. We went [to Uncle Al's] at around [6 p.m.] to watch the [Super Bowl]. While at Uncle Al's I had approximately four (4) beers. At half-time Susan wanted to leave and go to Tortilla Flat. When we arrived at Tortilla [Flat] Susan got involved in a card game, and I was watching the [Super Bowl] on the TV. While I was watching the game I had two (2) beers. Approximately forty five minutes to an hour after the game myself [sic] and Susan were getting ready to leave and go home. As we started walking out of the bar area Susan saw [the victim] sitting at the bar [and] she went up to him to say hello, [and] [h]e then got ugly with her. [The victim] turned and said to me is that your bitch you better contain your bitch. I then told Susan lets [sic] go. We then started to walk out the door and [the victim] pushed me and then punched me in the nose, [and] I fell to the floor and [the victim] was on top of me hitting me. I then pulled my gun out and pointed it at him and told him that it was over and to stop or I'll shoot, [the victim] then grabbed my gun. We struggled a while but I didn't let go of the gun, when [the victim] got off of me, I put my gun back in the holster and I ran into the kitchen, I was going to run out the door, but I was concerned where Su[san] was. When I was in the kitchen the next thing I know is that [the victim] was in the kitchen and coming after me, I then pulled my weapon again and pointed it at [the victim] and told him to stop or that I'll shoot. [The victim] then reached around to his back with his hand and I thought that he was reaching for a gun. I then fired my gun, I kept pulling the trigger until the gun was empty. [The victim] then fell to the floor. When the gun was empty I holstered it and stepped away. Then I saw that some of his friends [were] coming into the kitchen. I was approximately 15 to 20 feet away from [the victim] when I fired the shots." The defendant also had repeated the substance of this statement in several letters that he sent to Bruemmer. Those letters also were introduced into evidence.

[102]  *fn10 Officer Bishop testified that "[t]here was a screen door and ... an interior door which was open. The screen door was closed, but the interior door was open."

[103]  *fn11 We note that the defendant does not challenge the propriety of any aspect of the trial court's instructions on self-defense.



[104]   *fn12 See footnote 6 of this opinion for the relevant text of § 53a-19.

[105]   *fn13 The letters that the defendant sent to Bruemmer; see footnote 9 of this opinion; also contained no mention of the defendant's purported fear of being beaten by the victim.

[106]   *fn14 The state also claims that the jury reasonably could have rejected the defendant's claim of self-defense because the evidence supported a finding that the defendant was the initial aggressor and that he did not withdraw from his encounter with the victim upon effectively communicating to the victim his intent to do so. See General Statutes § 53a-19 (c). We do not reach this contention in light of the other reasons, which we set forth in the text of this opinion, why the jury properly could have rejected the defendant's claim of self-defense.

[107]   *fn15 As we previously have indicated; see part I of this opinion; forensic evidence introduced by the state established that the defendant was only two to three feet from the victim when the defendant shot him.

[108]   *fn16 A neurologist is a physician who specializes in the diagnosis and treatment of diseases of the nervous system, including the brain. See Merriam Webster's Collegiate Dictionary (11th Ed. 2003) p. 833. A neuroscientist is a scientist who studies the function of the nervous system. See id., p. 834. In addition to a doctorate degree in medicine, Taub also has a PhD in neuroscience.

[109]   *fn17 In preparing his testimony, Taub also reviewed the defendant's statement to police, police reports, the testimony of various police officers, the statements and testimony of a number of eyewitnesses, a "criminalistics" report, the autopsy report and the forensic pathologist's testimony. Taub never interviewed or personally examined the defendant, however.

[110]   *fn18 Taub explained the defendant's statements about his Marine Corps experience as follows: "[T]hat sort of statement, which can be checked [for accuracy] almost instantaneously, and being grossly incorrect, is, to me, an example of confabulation. And what happens is that individuals who have been injured, not understanding ... precise[ly] ... what has [transpired] before[hand], try to make sense of it, and use various kinds of schemes or programs that they already have which may be unrelated entirely to what is going on, and simply say it. And you see this in the hospital all the time. I mean, you will interview people and you will ask them, Did I see you in the bar last night? And, at first, they will not be clear. And then they will develop an entire story and build that story around a little kernel of some sort of memory or scheme that they have. And, to me, [the defendant's exaggeration of the nature of his involvement in the Marine Corps] was a striking example ... of post-traumatic confabulation." Another expert witness in an unrelated case described confabulation as "a mental defect where[by] someone who has a poor or missing memory thinks that they have a memory and will tell you what happened when it didn't. . . . It is a false memory. It is not a lie. It is a belief the patient has which simply has no basis in fact." (Internal quotation marks omitted.) State v. Kaddah, 250 Conn. 563, 571-72, 736 A.2d 902 (1999).

[111]   *fn19 We note that the assistant state's attorney did not object to defense counsel's use of Taub's



testimony insofar at it related to the defendant's memory and to his ability to perceive and recall distances. The state did object, however, to testimony by Taub concerning the effect of the defendant's injuries on his general cognitive abilities. In particular, the state claimed that such testimony necessarily would be speculative in view of the fact that Taub never had examined or interviewed the victim personally, either immediately following the shooting or at any time thereafter.

[112]   *fn20 "The right to compulsory process is fundamental to due process of law and is applied to state prosecutions through the due process clause of the fourteenth amendment. Washington v. Texas, 388 U.S. 14, 18-19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)." State v. Cerreta, 260 Conn. 251, 261 n.8, 796 A.2d 1176 (2002).

[113]   *fn21 On appeal, the defendant also claims that Taub would have testified regarding the "neurological effects of life-threatening stress, separate from the effects of the concussion ...." The state contends that the defendant failed to raise this claim in the trial court and, therefore, we should not consider it. See Practice Book § 60-5. The defendant counters that the claim adequately was preserved by virtue of defense counsel's statement, made in connection with her offer of proof relating to Taub's testimony, that Taub would testify about "some of the physiological changes in the body, the things that actually happen in the body [following a blow to the head], the [endocrinological] changes, [the defendant's] physiological changes. [Taub] would also testify as to the repetitive body functions and its association and relationship to head injure[ies]." We agree with the state that defense counsel's statements in this regard were not sufficiently clear and specific to alert the court that defense counsel intended to elicit testimony from Taub regarding the likely effect of stress on the defendant. Because the defendant failed to identify the purpose of the proffered evidence adequately so that the court could determine its admissibility, we decline to review the defendant's claim. See, e.g., Burns v. Hanson, 249 Conn. 809, 824, 734 A.2d 964 (1999).

[114]   *fn22 The defendant also contends that Taub would have testified about the defendant's allegedly hyperemotional behavior and volubility as depicted on the videotape. The defendant has failed to explain, however, why such testimony was relevant or how its exclusion, if improper, harmed him. In the absence of any such explanation, the defendant cannot prevail on his claim.

[115]   *fn23 The fifth amendment to the United States constitution provides in relevant part: "No person shall ... be subject for the same offense to be twice put in jeopardy of life or limb . . . ." The double jeopardy clause of the fifth amendment is applicable to the states through the due process clause of the fourteenth amendment. Benton v. Maryland, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).

[116]   *fn24 In State v. Sawyer, supra, 227 Conn. 579, we held that, to ensure that the greater offense has been determined by unanimous agreement, the court is required to instruct the jury to reach a unanimous decision on the issue of guilt or innocence with respect to that greater offense before considering any lesser included offense.



[117]   *fn25 In elaborating on the proper sequence in which the jury was to consider the defendant's culpability for murder and the lesser included offenses, the court, Moraghan, J., instructed the jury in relevant part: "So, there are three possible charges that you can consider. The first is murder. And if you find the defendant guilty of murder, you'll go no farther .... If you find he is not guilty of murder, then you will consider manslaughter in the first degree with a firearm.... If you find him not guilty of that, then you go under criminally negligent homicide. But if you find murder, you'll stop there.... If you don't find it, you'll consider manslaughter in the first degree and if you find manslaughter in the first degree, you'll stop there. If you don't find manslaughter in the first degree with a firearm, obviously, it has to be with a firearm in this case, then you go to criminally negligent homicide."

[118]   *fn26 In the first trial, the court received a total of twenty-seven notes from the jury during the course of jury deliberations. We refer only to those notes that are relevant to the defendant's double jeopardy claim, however.

[119]   *fn27 The jury also asked whether there is a distinction between intent and premeditation.

[120]   *fn28 The court characterized them as questions even though they were of an assertive nature.

[121]   *fn29 "A Chip Smith instruction reminds the jurors that they must act unanimously, while also encouraging a deadlocked jury to reach unanimity. See State v. Smith, 49 Conn. 376 (1881); see also 5 Connecticut Practice, D. Borden & L. Orland, Connecticut Criminal Jury Instructions (1986) § 4.8." (Internal quotation marks omitted.) State v. Pare, 253 Conn. 611, 616 n.4, 755 A.2d 180 (2000).

[122]   *fn30 The defendant had filed an earlier motion to dismiss the murder charge, on grounds of double jeopardy, on March 10, 2000. On March 28, 2000, the court reserved decision on that motion until immediately prior to the defendant's retrial. The defendant appealed the court's refusal to entertain his motion to dismiss until that later date. This court granted the state's motion to dismiss that appeal on July 13, 2000.

[123]   *fn31 "[A] judge may declare a mistrial without the defendant's consent only if there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." (Internal quotation marks omitted.) State v. Tate, 256 Conn. 262, 286, 773 A.2d 308 (2001).

[124]   *fn32 We note that there is an exception to this general rule when " prosecutorial or judicial overreaching is designed to provoke the defendant into asking for a mistrial, thereby avoiding an acquittal or affording the state another, perhaps more favorable, opportunity to convict ...." (Internal quotation marks omitted.) State v. Butler, supra, 262 Conn. 176. In the present case, the defendant does not claim that either the trial court or the assistant state's attorney improperly goaded him into seeking a mistrial. Accordingly, this exception to the general rule is inapplicable.



[125]   *fn33 The state contends that the defendant waived any double jeopardy claim he may have had regarding the manslaughter charge by failing to seek dismissal of that charge prior to the commencement of the second trial. The defendant contends that he did not waive his claim because he sought dismissal of the charge before the court had rendered judgment in accordance with the jury verdict of guilty. We need not reach this claim in light of our conclusion that the defendant consented to the trial court's declaration of the mistrial.

[126]   *fn34 Contrary to the defendant's claim, the fact that his motion for a mistrial was predicated on a claim of judicial coercion rather than juror deadlock does not militate against the conclusion that his motion was indicative of his consent to a mistrial. See State v. Knight, 616 S.W.2d 593, 596-97 (Tenn.) (fact that defendant's motion for mistrial was based on different ground than that relied on by court in declaring mistrial was irrelevant to issue of whether defendant consented to mistrial inasmuch as defendant's motion reflected willingness to give up right to have case decided by jury already impaneled), cert. denied, 454 U.S. 1097, 102 S. Ct. 670, 70 L. Ed. 2d 638 (1981).

20040113 20040113 20040113

© 1992-2004 VersusLaw Inc.



Ground 3                                                                         **ATTACHMENT (5)**

Saunders was denied due process of law under the fourteenth amendment to the United States Constitution when the state charged 2 separate and distinct offenses as alternative methods of committing a single offense vitiating his defense of justification. Supporting facts:

After a mistrial to the charge of murder with the lesser included offenses of intentional manslaughter in the 1st degree with a firearm § 53a-55a(1) and negligent homicide, Saunders was charged with a single count of intentional manslaughter in the 1st degree § 53a-55a(1). Saunders plead justification and proceeded to trial. Fourteen days prior to the commencement of that trial the state filed a substitute information charging manslaughter in the 1st degree with a firearm under subsections (1) intentional conduct and (3) extreme indifference conduct and offered these offenses as an alternative method of committing a single offense.

By the state injecting the additional offense of 1st degree manslaughter with a firearm under subsection (3) and offering it as an alternative method of committing a single offense, it transformed a specific intent crime into a general intent crime which allowed the jury to return a verdict without finding concurrence of intent with the act of shooting. Intentional and reckless manslaughter with a firearm are two separate and distinct crimes, intentional manslaughter requires specific intent as reckless requires a general intent.

Trial counsel's performance cannot be considered to be within the wide range of professionally competent assistance. Counsel failed to object to charging these separate offenses resulting in an implication and subsequent jury instruction that there



was a factual dispute for the jury to resolve regarding both theories of criminal liability.

Self-defense is an intentional act.



Ground 4                                             ATTACHMENT (6)

Saunders' constitutional protection against a directed jury verdict was violated within the meaning of the sixth amendment when trial counsel failed to object to the court's instruction directing a verdict in favor of the state.

Supporting facts:

This ground espouses the previous in that Saunders' sole defense was justification, self-defense is an intentional act. If a defendant asserts a recognized defense and the evidence indicates the availability of that defense such a charge is obligatory and the defendant is entitled as a matter of law to a theory of defense instruction. The defendant's right to such an instruction rests on the principles of due process. This fundamental constitutional right includes proper jury instructions on self-defense.

In *Saunders (2)* self-defense instructions included Saunders concession to intentional conduct. Additional instructions included: all elements of self-defense as defined in C.G.S. § 53-19 and if a single element failed or was determined unreasonable the entire defense of justification fails resulting in a guilty verdict.

The court instructed the jury that manslaughter in the 1st degree with a firearm § 53a-55a (1) intentional conduct and manslaughter in the 1st degree with a firearm § 53a-55a(3) extreme indifference conduct are merely alternative methods of committing a single offense. Compounding that violation was the court's instruction to "just decide one" either "intentional" based on your view of the evidence and the law or "reckless" based on your view of the evidence and the law, "just decide one". This constitutionally erroneous jury instruction improperly removed the element of



justification and in effect commanded a directed verdict for the state, either subsection results in conviction.



Ground 5                                                                                                                                                     ATTACHMENT (7)

Saunders was denied his right to effective assistance of counsel under the sixth amendment to the United States constitution when trial counsel failed to make obvious and meritorious objection to tainted evidence forming the basis of the state's case.

Supporting facts:

After a mistrial in *Saunders 1*, it was brought to the attention of trial counsel that the 911 emergency transmissions played as presence sense impression in front of the jury was tainted and could not have happened in the order presented. Trial counsel failed to obtain expert testimony despite Saunders' own experts findings. After analyzation, the tape submitted by the prosecutor had the decedent in the kitchen and shot prior to Saunders arrival. Seven shots were fired in 2 seconds from 2 different directions (Saunders legally carried a 5-shot revolver) and the state's witnesses could not have been in their stated position as they would have been directly in the line of fire. Trial counsel went on record in *Saunders 2* repeatedly stating he had "no reason to believe the tape was fabricated." State appointed habeas counsel compounded this issue by informing the habeas court that he was going to present expert testimony on this issue and 3 days prior to trial filed and an *Anders* brief. The original 911 tape #26 has never been played in its original format before any trier of fact.

(Please see attached motion to preserve relevant evidence.)



Ground 6                                                                              ATTACHMENT (8)

Saunders was denied his right to effective assistance of counsel under the sixth amendment to the United States constitution when trial counsel failed to challenge and subsequently prove the decedent was armed and in fact fired at Saunders forcing him to defend himself.

Supporting facts:

Defense attorneys had in their possession blood evidence that was removed from the ceiling of the crime scene. This evidence was secured by a properly licensed detective and certified crime scene technician. This evidence was directly in the line of trajectory to the self-inflicted gunshot wound of the decedent.[1]

The state maintains that entry wound B(6) and exit wound 1 was shot by Saunders as the decedent spun. The location of the blood evidence in conjunction with the analysis of the 911 tapes would unequivocally prove the decedent was armed and shot himself while trying to shoot Saunders.

A 5-shot revolver cannot shoot 7 shots in 2 seconds from diametrically opposing directions.

The Connecticut Supreme Court relied and opined on the misinformation concluding at [36]: "The evidence supported a finding that the defendant could have stopped firing but elected not to even though the victim no longer posed a threat because with his back facing the defendant he was not in a position to shoot at or otherwise injure the defendant."

Had defense counsel presented the information and evidence it had in its possession there is a reasonable probability the outcome of the trial would have been different.

---

[1] Please see attached motion in support of requested discovery; sections 43-52 further inform this claim.



alternatives, and finally Murray continually vouched for the credibility of witnesses in his summation. Exemplary statements include:

"Let's forget about Sue Bruemmer, pull her out of the equation, pull Sue Bruemmer out of the equation, Patty Joy out of the equation and Steph Jacobson, just forget about Sue for a second, just go by what the other witnesses said."

"I don't want to get myself in trouble here but sometimes men have a better understanding about that one or one type fighting issue between men because men it seems engage in that type of behavior and I would ask for the other juror (the only woman juror on the panel) to listen to what the have to say on that."

"You know the only way the defense could establish that Sue might have been pushed was to bring in these 2 people who were never in the bar, who don't like Sue and they got on the stand and said Sue said this in our presence. It's hard to combat that type of information. We could bring in a 3rd person to say another person said something to you, it's tough, it really is, that's why I object to it. I don't think its good and I don't think its reliable."

Absent the cumulative misconduct there is a reasonable probability the outcome of the trial would have been different.



Ground 8                                                                    ATTACHMENT (10)

      Saunders was denied due process of the law under the fourteenth amendment of the United State's constitution when the prosecutor elicited false testimony regarding suppressed material evidence and repeatedly referred to it during his closing summation.

Supporting facts:

  A. Bullet recovery:

      At time of trial Murray elicited testimony from crime scene investigator (CSI) Roger Brooks that he recovered 5 bullets, 2 from the body of the decedent, one on the floor, one on the counter and a combination of a jacket and shell against the wall in the kitchen.

      Murray then elicited testimony from shift supervisor Sgt. Alan Mattei. Mattei arrived on scene at 23:15, Mattei instructed police officer Emicke who arrived with him to cover spent slugs, one being 4 feet east of the victim on the floor and one on the counter.

      Murray elicited testimony from fire fighter Fred Pollard who was the first to administer aid to the decedent. Pollard's ambulance response log indicates a call for assistance was placed to EMS at 23:16. Six minutes later Pollard was on scene and at 23:23 eight minutes later was let in to treat the patient. Pollard describes a bullet east of the victim's head on the floor and one under victim's left side which "fell out" after clothing was cut from victim. Pollard claims he either gave this bullet to unknown officer or he placed it on the counter.

      The spent slug described by Mattei on the counter when he initially "walked in" at


(95)

23:15 and ordered Emicke to preserve by placing cups over them can not be the same slug that was recovered 8 minutes later by Pollard. Murray stated in his closing summation: "How do we know there was not another gun? Well, we have 5 shells, we have 5 bullets, two are in the body, one is on the floor, one is on the countertop and there's a combination of the jacket and shell against the wall, 5 bullets, 5 shots, 5 casings all fired from the decedent's gun. The addition works out perfectly." The addition does not work out perfectly.

   B. The decedent's firearm:

Supplementary to the prosecutorial misconduct claims above Murray repeatedly referenced the suppressed firearm of the decedent within his closing arguments.

   "He knows himself that in order to get a good self-defense claim he's got to get you to believe that he honestly thought Dominic had a gun. That's the argument I'm making, even the defendant must sell the self-defense claim in order to be successful. He must establish Dominic was reaching for a gun." (pg 6 closing arguments)

   "I think there's a big credibility problem here. He didn't honestly believe that Dominic was going to shoot him---Well, he didn't honestly believe that he was going to be killed because he had a gun and Dominic didn't and he knew that." (pg 9 closing arguments)

   "Dominic didn't need a gun. If Dominic had a gun he could have pulled it in the bar. Would Dominic walk all the way across the length of the whole kitchen before he pulled a gun? I think Dominic might have and his gun out first if he had a gun. No one could have taken a gun from Dominic on the floor in the kitchen because the defendant was still armed and had just killed somebody. (pg 21 closing arguments)



Ground 9                                                                                                                             ATTACHMENT (11)

     Saunders was denied the protection provided by the sixth amendment to the United States constitution when the state's attorney obtained highly prejudicial statements from named witnesses on the day of sentencing preventing Saunders from confronting these witnesses.

Supporting facts:

     Murray identified 2 witnesses in March of 1998. Murray claimed in writing he may present evidence that Saunders allegedly brandished a firearm at their residence specifically towards his then girlfriend. This allegation was thoroughly investigated, parties interviewed and defense was ready to confront these named witnesses.

     The named witnesses were never called in *Saunders 1*. In 1998 Murray communicated in writing that the state does not intend on using any alleged prior misconduct during its case in chief and again referenced the fabricated brandishing incident. Investigators for Saunders went again to alleged victim and she stated as did Saunders that this incident never happened. None of it was brought up in either trial of Saunders, neither witness was called.

     After conviction and on the day of sentencing, May 30, 2001, four years after the identification of these witnesses Murray sends his investigator to the named witnesses and produces 2 sworn statements again claiming this brandishing incident occurred.

     Saunders could not confront these accusers. Counsel for Saunders vigorously objected to which the sentencing judge after accepting these known false statements claimed, "The court in sentencing will apply whatever weight it intends to apply to all the materials submitted by counsel on behalf of their respective positions and consider and



sentence what the court finds appropriate."

By circumventing the confrontation clause within the U.S. constitution Saunders was denied his due process right to combat this known false testimony.

Absent this constitutional violation there is a reasonable probability that the outcome of the trial, sentencing and appeal would have been different.

